United States Courts
Southern District of Texas
F I L E D

MAY 20 2022

Nathan Ochsner, Clerk of Court

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| MICHAEL HOOD, | § | |
| Plaintiff, | § | |
| | § | NO. 4:22-cv-01126 |
| v. | § | |
| | § | |
| GULF CAPITAL BANK | § | JURY DEMANDED |
| JAMES EDWARD JONES | § | |
| DAN C. TUTCHER | | |
| STANLEY REED MORIAN | | |
| J. DAVID WILLIAMS | | |
| DONALD W. YOUNG | | |
| GEORGE DEMONTROND | | |
| JOHN P. KOTTS | | |
| JONATHAN C. HOMEYER | | |
| JOEL C. BAUMBACH | | |
| INSPERITY, INC. | | |
| INSPERITY HOLDINGS, INC. | | |
| INSPERITY ENTERPRISES, INC. | | |
| INSPERITY PEO SERVICES, L.P. | | |
| INSPERITY BUSINESS | | |
| SERVICES, L.P. | | |
| INSPERITY PAYROLL | | |
| SERVICES, L.L.C. | | |
| | | |
| Defendants. | § | |

*"I think it's easier for white men to have compassion and be able to see more objectively what discrimination based on sex or gender has done, because they have mothers and they have wives and they have daughters. You can't extend that same compassion to people who are not part of your own family. I mean if you're looking for an excuse you know, 'Hell, them niggers are fine, but goddammit, let them stay over there and go to their own school. Them Mexicans are ok, but you let them stay down there in the Valley and chop cotton and all that'."* **TX Associate Justice Oscar Mauzy, April 1996**

## PLAINTIFF'S FIRST AMENDED PETITION AND COMPLAINT

TO THE HONORABLE CHIEF JUDGE LEE H. ROSENTHAL OF SAID COURT:

    Plaintiff, Michael Hood ("Hood" or "Plaintiff"), files this First Amended Complaint

against Defendants Gulf Capital Bank ("Gulf Capital" or "Bank"), James Edward Jones, Dan C. Tutcher, Stanley Reed Morian, J. David Williams, Donald W. Young, George DeMontrond, John P. Kotts (together as "Bank Board of Directors"), James Edward Jones, Jonathan C. Homeyer, Joel C. Baumbach (together "Bank executives" or "Bank management"), Insperity, Inc., Insperity Holdings, Inc., Insperity Enterprises, Inc., Insperity PEO Services, L.P., Insperity Business Services, L.P., and Insperity Payroll Services, L.L.C. ( together "Insperity" and with "Gulf Capital" or "Bank" being "Defendants") alleging violations of the Texas Commission on Human Rights Act (TCHRA), Tex. Lab. Code § 21.001, *et. seq.,* Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e, et seq.; and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112;  and would show as follows:

## PARTIES

1.      Plaintiff Michael Hood is an individual residing in Harris County, Texas.

2.      Plaintiff intends to conduct discovery under Level 2 of the Texas Rules of Civil Procedure.

3.      Plaintiff seeks monetary relief over $200,000 but not more than $1,000,000.

4.      On information and belief, Defendants Gulf Capital and Insperity are individual Texas corporations that are each authorized to do business in Texas and are doing business in Texas. At all relevant times Defendant Gulf Capital Bank and Defendant Insperity were employers of Plaintiff. Insperity is a publicly-traded firm on the NYSE under the ticker symbol NSP.

## JURISDICTION

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

## **VENUE**

6.     Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391(b).  Gulf

Capital and Insperity each does business in this District and maintains offices in this District,

and the unlawful conduct alleged in this Complaint occurred in this District.

# FACTUAL ALLEGATIONS

*"I'd rather be a doorkeeper in the house of my God than to dwell in the tents of wickedness."* **Psalm 84:10**

7.      Defendant Gulf Capital Bank operates in Texas and may be served via its registered agent on file with the Texas Secretary of State as: James E. Jones, One Riverway, Suite 150, Houston, TX 77056.

8.      Defendant James Edward Jones resides in Harris County, Texas and may be served at 3 S West Oak Dr, Houston, TX 77056, or wherever he may be found.

9.      Defendant Dan C. Tutcher resides in Harris County, Texas and may be served at 1 Shadder Way, Houston, TX 77019, or wherever he may be found.

10.     Defendant Stanley Reed Morian resides in Harris County, Texas and may be served at 6 Shadder Way, Houston, TX 77019, or wherever he may be found.

11.     Defendant J. David Williams resides in Kerr County, Texas and may be served at 304 Overlook Dr, Kerrville, TX 78028, or wherever he may be found.

12.     Defendant Donald W. Young resides in Harris County, Texas and may be served at 3311 Del Monte, Houston, TX 77019, or wherever he may be found.

13.     Defendant George DeMontrond resides in Texas and may be served at 14101 North Freeway, Houston, TX 77090, or wherever he may be found.

14.     Defendant John P. Kotts resides in Harris County, Texas and may be served at 3737 Willowick Rd, Houston, TX 77019, or wherever he may be found.

15.     Defendant Jonathan C. Homeyer resides in Montgomery County, Texas and may be served at 51 Golden Sunset Cir, Spring, TX 77381, or wherever he may be found.

16.     Defendant Joel C. Baumbach resides in Harris County, Texas and may be served at 2808

Southmore Blvd, Houston, TX 77004, or wherever he may be found.

17.    Defendants Insperity, Inc., Insperity Holdings, Inc., Insperity Enterprises, Inc., Insperity PEO Services, L.P., Insperity Business Services, L.P., and Insperity Payroll Services, L.L.C. operate in Texas and may be served via the registered agent on file with the Texas Secretary of State as: Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701.

18.    Insperity at all times relevant acted as the Bank's human resources function, Mr. Hood's joint-employer, and was aware of Mr. Hood's leave and accommodation requests his race and disability. Insperity confirmed this information for Jonathan Homeyer who then passed it on to Mr. Jones. Indeed, Insperity employees sent Mr. Hood the required forms for medical leave and counseled Mr. Hood with respect to disability accommodations. Further, Insperity provided the employee handbook for Gulf Capital Bank.

19.    Hood is an African American male who has worked in financial services for his entire career including in the cities of Houston, Dallas, Birmingham, Charlotte, and New York City.

20.    Hood's banking clients have included small businesses, individual American billionaires, and some of the most recognizable Fortune 500 companies in the world.

21.    Hood holds a BBA (Finance) from Mays Business School at Texas A&M University where he graduated with honors and served as both a University Scholar and the University's sole nominee for the international Rhodes Scholar award to study at Oxford University, United Kingdom.

22.    Hood joined Gulf Capital as a Senior Relationship Manager on or about June 15, 2020.

23.    While employed at Gulf Capital, Hood was subjected to unlawful treatment by Bank supervisors and managers because of his race and/or disability.

24.    Bank Chairman and CEO James Edward Jones ("Jones") discriminated against Hood, a

black American man with a known disability (that Mr. Hood discussed with Bank management and Insperity) who had expressed concern that Gulf Capital Bank may have caused a client to violate federal law and who had previously filed a race discrimination lawsuit.

25. For example, Chairman/CEO Jones was critical of Mr. Hood for not wearing a suit jacket at one point despite not commenting on this to white male bankers not wearing a suit jacket. This is in stark contrast to Chairman/CEO Jones' white female Chief of Staff who wears back porch flip flops to the office every day—even to board meetings.

26. Jones' discrimination, harassment, and retaliation aggravated Hood's known mental health condition and caused him substantial emotional distress. Bank executives intentionally inflicted emotional harm upon Mr. Hood.

27. Jones thinks of himself as a continuation of Ben Love—a silly if not asinine proposition to admire antique business ideas given the light speed of changes happening in financial services not to mention carrying over from a business culture when white males relegated white women to secretaries (and mistresses) and blacks as servers and kitchen cooks in the corporate dining room.

28. Jones (white male) picked an unlawful fight with a strong black American male, didn't like that he was miserably losing said fight, became a sore loser, and fired Mr. Hood in retaliation for seeking medical leave, an ADA accommodation, raising concerns about potential loan fraud, and a race discrimination lawsuit alleging violations of laws administered by the Texas Commission on Human Rights against a friend of Gulf Capital Bank President Jonathan Homeyer (Texas A&M University '90 and '93) a one Jeff Dudderar (formerly with BBVA/PNC Bank; now with Prosperity Bank).

29. Hood joined Gulf Capital Bank in June 2020 at below market salary and benefits owing to

the promise of substantial equity returns in the future.

30.   Hood was a steady and high-performing banker, leadership's view of him changed for the worse when Mr. Hood's lawsuit against BBVA USA / PNC Bank was publicized in November 2020.

31.   Gulf Capital Bank's executive management team and board of directors were alarmed when portions of Mr. Hood's lawsuit against BBVA USA / PNC Bank were published in the Houston Chronicle and the Houston Business Journal discussing the lawsuit that included BBVA's Chief Human Resources Officer, Rosilyn Houston (now with Santander USA) and Executive Vice President Jeff Dudderar (now with Houston-based Prosperity Bank). Further, Chairman/CEO Jones' anger over Mr. Hood's lawsuit against BBVA USA / PNC is also because BBVA USA (f/k/a Compass Bank) holds the mortgage on Mr. Jones' spouse's home, Brenda Franks Love, at 3 S West Oak Dr 77056 (Chairman/CEO Jones is not on the property deed, however).

# JOHN AND LOTTIE "J.E. AND L.E." MABEE FOUNDATION – CORPORATE STOCK HOLDINGS

| Name of Stock | End of Year Book Value | End of Year Fair Market Value |
|---|---|---|
| ABBVIE INC. | 37,060,830 | 26,276,278 |
| AIR PRODUCTS & CHEMICALS, INC. | 14,438,127 | 40,846,336 |
| APPLE, INC. | 15,628,997 | 15,864,240 |
| ASTRAZENECA PLC (ADR) | 13,879,413 | 25,937,280 |
| AT&T INC. | 21,865,872 | 22,767,382 |
| BOEING CO | 25,352,155 | 24,903,756 |
| BP PLC (ADR) | 16,296,303 | 19,154,030 |
| BRISTOL-MYERS SQUIBB COMPANY | 19,767,066 | 15,867,907 |
| CHEVRON CORPORATION | 4,298,487 | 38,280,425 |
| COLGATE-PALMOLIVE COMPANY | 6,087,176 | 12,130,940 |
| CISCO SYSTEMS INC | 5,882,328 | 6,459,780 |
| CORTEVA INC | 3,396,597 | 4,311,975 |
| CREDIT SUISSE GROUP AG ADR | 8,885,316 | 5,664,800 |
| DOW INC. | 6,445,369 | 9,990,193 |
| DUPONT DE NEMOURS INC | 9,362,705 | 6,269,424 |
| EATON CORP PLC | 18,055,842 | 18,379,944 |
| ENLINK MIDSTREAM LLC | 4,439,293 | 2,238,905 |
| EXXON MOBIL CORPORATION | 1,061,865 | 26,814,577 |

| Name of Stock | End of Year Book Value | End of Year Fair Market Value |
|---|---|---|
| EXXON MOBIL CORPORATION | 1,061,865 | 26,814,577 |
| FORD MOTOR COMPANY | 8,137,363 | 6,788,093 |
| HEWLETT PACKARD | 10,823,133 | 8,290,857 |
| HONEYWELL INTERNATIONAL INC. | 22,262,266 | 41,594,700 |
| INTEL CORP | 9,970,409 | 9,150,130 |
| JOHNSON & JOHNSON | 1,295,794 | 30,485,500 |
| JPMORGAN CHASE & CO. | 14,274,819 | 35,107,960 |
| KINDER MORGAN INC | 13,186,857 | 14,158,595 |
| LOCKHEED MARTIN | 12,500,211 | 14,961,085 |
| LYONDELLBASELL INDUSTRIES NV | 8,111,191 | 5,281,185 |
| MCDONALD'S CORPORATION | 8,341,995 | 29,861,890 |
| MERCK & CO., INC. | 14,887,406 | 33,698,712 |
| MICROSOFT CORPORATION | 9,787,978 | 85,335,340 |

| Name of Stock | End of Year Book Value | End of Year Fair Market Value |
|---|---|---|
| NIKE, INC. | 24,633,137 | 25,911,249 |
| ONE GAS INC | 1,106,034 | 6,917,379 |
| ONEOK, INC. | 9,687,463 | 26,226,478 |
| PEPSICO INC | 3,171,715 | 18,339,868 |
| PFIZER, INC. | 5,371,403 | 21,505,119 |
| PHILIP MORRIS INTERNATIONAL INC. | 20,522,351 | 21,663,045 |
| PLAINS GP HOLDINGS LP | 10,061,825 | 7,787,080 |
| PROGRESSIVE CORP | 20,034,068 | 21,079,980 |
| ROYAL BANK OF CANADA (USA) | 18,057,369 | 22,592,472 |
| ROYAL DUTCH SHELL PLC (ADR) | 24,649,509 | 21,328,200 |
| SCHLUMBERGER LIMITED | 12,131,143 | 4,507,770 |
| TARGA RESOURCES CORP | 6,264,479 | 4,468,044 |
| THERMO FISHER SCIENTIFIC INC. | 7,440,297 | 50,752,208 |
| TJX COMPANIES INC | 11,254,566 | 11,241,365 |
| TOTAL SA ADR | 9,209,338 | 7,879,123 |
| TRANS CANADA CORP | 6,906,990 | 7,875,588 |
| UBS GROUP AG | 8,912,947 | 4,909,920 |
| UNITED TECHNOLOGIES CORPORATION | 15,606,300 | 26,341,040 |
| VERIZON COMMUNICATIONS INC. | 18,986,326 | 31,011,203 |
| WAL-MART STORES, INC. | 19,318,110 | 23,076,292 |
| WELLS FARGO & CO | 28,929,671 | 24,882,351 |
| WILLIAMS COMPANIES, INC. | 19,063,747 | 16,114,080 |
| YUM! BRANDS, INC. | 3,890,795 | 15,648,520 |

32.    Hood also believes that Jones' conflict of interest given his position on the Mabee Foundation of Midland with significant holdings in financial services companies and ties to Houston charities that could run afoul of PNC/BBVA's interests related to Mr. Hood's lawsuit and the reputation risk that President Homeyer cited. Listed above are the equity holdings of the Mabee Foundation where Chairman/CEO Jones earns $40,000 cash compensation annually and uses his wife's Brenda Love's business address.

33.    On or about Nov 25, 2020, Hood's manager, Bank President Jonathan Homeyer, a former Regional President for fake accounts and fake interviews of black job applicants at scandal-plagued Wells Fargo Bank (a corporate stock holding of the Mabee Foundation), was so livid when he saw the lawsuit's coverage and allegations in the Chronicle that he immediately phoned Hood berating him that they meet face to face at the soonest to discuss the lawsuit ostensibly owing to concern of how much time Hood would have to spend on the lawsuit but in reality and explicitly stated concern over having Mr. Hood employed at Gulf Capital Bank and any negative reputational impact on Gulf Capital Bank stemming from the lawsuit's publicity.

34.    President Homeyer brought up the lawsuit during other regular meetings with Mr. Hood between December 2020 and Aug 17, 2021.

35.    Gulf Capital Bank Chief Credit Officer Tricia Atchison, as a law school student at South Texas College of Law with access to Lexis Nexis and other legal databases, researched Mr. Hood's previously filed lawsuit and based on her disagreement with the contents thereof, abused her position to unfairly "push back" on many of Hood's otherwise sound credit opportunities as a way of retaliating for the lawsuit while supporting other less creditworthy deals over Hood's objections.

36.    In clear violation of HIPPA and ADA, President Homeyer asks Hood about his health again

on August 17, 2021, and Hood disclosed that he is being treated for various GI health and mental health conditions qualifying under federal and state law as disabilities.

37.    On or about Aug 17, 2021, Hood tells President Homeyer that he will need to take medical leave and seek accommodation (the ability to telecommute) per a letter from Hood's treating physician for his health conditions.

38.    President Homeyer tells Mr. Hood that he "is not a face time guy" and the job of a Senior Relationship Manager does not necessitate being in the office on a daily basis so long as President Homeyer "knows what's going on."

39.    The same day, President Homeyer says that he saw where Jeff Dudderar's announcement that he took another bank job outside of BBVA and asks Mr. Hood if Jeff Dudderar was fired from BBVA because of Mr. Hood's lawsuit.

40.    President Homeyer told Hood that Stan Grisham said Hood was unprofessional. In response, Hood explained to President Homeyer that Grisham behaved racist by telling Hood that Hood "walk[s] around here like you're king of the world" at the office, which Hood took as intended to be a thinly-veiled "uppity nigger" comment.

41.    Hood tells President Homeyer that Grisham was angry that a black man like Hood had assumed responsibility for an account that Grisham put the client on a path toward bankruptcy by failing to read and ensure the loan documents complied with the federal CARES ACT re: Main Street Loan. Hood tells President Homeyer that Grisham is the unprofessional actor who attacked Mr. Hood with random claims that Mr. Hood would share confidential customer info and is a proud racist for his behavior. Mr. Hood also tells President Homeyer that Gulf Capital Bank may have caused a client to fraudulently represent information to the Federal Reserve Bank of Boston in violation of the CARES Act under the Main Street Lending Program.

42. Per the reasonable accommodation of his disability, Hood worked from home the next day.

43. The following day, August 19, 2021, allegedly alarmed at not seeing Mr. Hood in the office on August 18 and then seeing Mr. Hood "attempt" to leave at 2:15 PM, Chairman/CEO Jones verbally assaulted (telling Mr. Hood he is "unusual and weird" and "unlike" any other banker—ie Mr. Hood is the only black male banker and there must be something based on his racial identity) Mr. Hood with such vitriol in public before other employees including President Homeyer, Gigi Lopez, Leslie Fertitta, and Camille Bayer. Chairman/CEO Jones tells Mr. Hood that he is talking "stern" towards him. Mr. Hood asks Chairman/CEO Jones several questions to gain clarity on expectations including "why am I being singled out whereas many have left 'early' but some evil spirit has overtaken causing you to harass me."

44. Mr. Hood left the scene of the verbal assault in tears under pressure from Chairman/CEO Jones and President Homeyer.

45. Mr. Hood returns to the scene of the verbal assault twenty minutes later to find that Chairman/CEO Jones has called a meeting with President Homeyer, Chief of Human Resources Joel Craig Baumbach, and Camille Bayer. This is the meeting where these parties conspire to terminate Mr. Hood as Chairman/CEO Jones asserts he is concerned that Mr. Hood's medical issues may necessitate leave and accommodation and is incensed concerning Mr. Hood's claims of racism against Grisham (72-year old white male banker at Gulf Capital Bank) and that Gulf Capital Bank may have caused a Main Street Loan Program client to fraudulently present material information to the Federal Reserve Bank of Boston in violation of the federal CARES Act. Chairman/CEO Jones was increasingly angry that Mr. Hood reported that Senior Relationship Banker Stan Grisham made various egregious misrepresentations to the Federal Reserve Bank of Boston causing both Gulf Capital Bank and its loan client to fraudulently misrepresent its financial condition to the Federal Reserve

Bank of Boston in violation of federal law and the Main Street Loan Program under the CARES Act. Mr. Jones is further enraged to learn that Mr. Hood's lawsuit may have led to the termination of BBVA's Jeff Dudderar (a white male friend of President Homeyer). Mr. Hood tells Chairman/CEO Jones (in the presence of the other 3 persons) that in 25 years of working he had never been so verbally abused based on being a disabled black American male as had happened this day. Mr. Hood tells Chairman/CEO Jones that in the absence of clearer expectations, he would resume working from his workspace instead of leaving the office despite suffering GI symptoms.

46.    That same day, Jones left the office at 3:38 PM without being verbally assaulted. He was oftentimes not in the office and his assistant, Camille Bayer, usually had no idea of his whereabouts instead directing employees to just call his cell. White Senior Relationship Managers and other employees left the office between 1:30 PM and 3:00 PM and were not verbally assaulted by Chairman/CEO Ed Jones. In fact, Heather Baker white female, Chief Compliance Officer who left immediately after her 12 noon presentation to the Bank's Board of Directors or Matt Balinski, white male, who went to meet a repairman regarding a busted water pipe at his apartment complex) who had also left "early" that same day.

47.    Jones was not even Hood's supervisor.  Hood is 1 of 6 bankers at Gulf Capital Bank—hardly a critical role that requires the CEO's direct oversight!—except for Jones' desire to single out Mr. Hood as a black man with such immature but vitriolic descriptions such as "weird" and "unusual" and "no one else does that."

48.    **CAST OF ALL WHITE AND ALL MALE CHARACTERS**

| Gulf Capital Bank Board Member | Affiliation | Blacks in leadership | % Blacks in leadership |
|---|---|---|---|
| Ed Jones | Gulf Capital Bank | 0 (zero) | 0% (zero) |

| J. David Williams | Gulf Capital Bank / Happy State Bank | 0 (zero) | 0% (zero) |
| Reed Morian | DXP<br><br>Athena Gun Club<br><br>Rock Hill Capital | 0 (zero) | 0% (zero) |
| Donnie Young | RaceRock Group | 0 (zero) | 0% (zero) |
| Dan Tutcher | Enbridge / Brookfield | 0 (zero) | 0% (zero) |
| John Kotts | Cardinal Services<br><br>BouMatic<br><br>Rock Hill Capital | 0 (zero) | 0% (zero) |
| George DeMontrond | DeMontrod Automotive | 0 (zero) | 0% (zero) |

Source: Company websites and general knowledge.

49.    **GULF CAPITAL BANK BOARD OF DIRECTORS – COMPOSITION**

| Name | Board of Directors role | Race | Sex |
|---|---|---|---|
| James Edward Jones | Chairman | White | Male |
| Dan Tutcher | Vice Chairman | White | Male |
| John Kotts | Member | White | Male |
| Stanley Reed Morian | Member | White | Male |
| J. David Williams | Member | White | Male |
| Donnie Young | Member | White | Male |
| George DeMontrond | Member | White | Male |
| **% Share of Total** | | **100%** | **100%** |

50.    **GULF CAPITAL BANK – LENDER COMPOSITION**

| Name | Title | Race | Sex |
|------|-------|------|-----|
| Brenton Bellamy | Senior Lender | White | Male |
| Scott Odom | Senior Lender | White | Male |
| Stan Grisham | Senior Lender | White | Male |
| Jerry Garza | Senior Lender | White | Male |
| Matt Balinski | Lender | White | Male |
| % share of total | | 100% | 100% |

51.    Mr. Hood explained to Chairman/CEO Jones that he was the first one in the office that day and had worked starting at approximately 7 AM and through the day while having GI symptoms and not eating lunch so Mr. Hood could focus on his work only. Mr. Hood handled approximately 47 emails, held conversations with 14 Bank colleagues, and had a conference call with the Bank's largest client.

52.    After being told by Chairman/CEO Jones that Mr. Hood was "hangry" (invoking "angry black man stereotypes) and was talking "stern" (again connoting that Hood was an "uppity nigger"), Mr. Hood was told to leave the office.

53.    Chairman/CEO Jones also told Mr. Hood to eat lunch downstairs, as though banishing Mr. Hood to the slave quarters, in the unbranded, lousy deli with poor sanitary standards (employees have seen insects present in the deli and discovered foreign material in their food) so that he didn't have to leave the office building for lunch but yet, that very same day Chairman/CEO Jones had a catered lunch from Jason's Deli. Requests like this are racially based on Mr. Hood being African American, and Jones knows exactly his intent as a white American born before blacks could vote without a poll tax, literacy tests, or telling the

14

number of bubbles in a bar of soap. Chairman/CEO Jones did not make these ridiculous requests of other white male/female bankers and employees.

54.    Before being ran out of Chairman/CEO Jones' office, Mr. Hood asked Chairman/CEO Jones for any examples of client complaints or issues based on Chairman/CEO Jones' false perception of Mr. Hood's work habits. Chairman/CEO Jones responded by saying "you don't want to know that." When Mr. Hood asked Chairman/CEO Jones if he had treated any other employees in this fashion, Chairman/CEO Jones declined to answer. Nevertheless, Chairman/CEO Jones' words that it's "weird and unusual" to work a "couple of hours and then leave"—ignoring the fact that 7 AM to 2:15 PM is more than a "couple of hours" as most people consider a "couple" to mean a quantity of two. Mr. Hood asked Chairman/CEO Jones for evidence of this, and again, Chairman/CEO Jones declined.

55.    Chairman/CEO Jones effectively and deliberately called Mr. Hood a thief by falsely accusing Mr. Hood of "leaving early" without any desire to discover the facts. This is classic racism to criminalize a black man based on his race and applying Chairman/CEO Jones' racial biases.

56.    Chairman/CEO Jones took umbrage with Mr. Hood's desire to use the front door (by Jones' office) rather than the backdoor to enter/exit the Gulf Capital Bank suite as the other non-"weird" -- non-"unusual" –non-black male bankers used the back door so that Chairman/CEO Jones could not monitor their entrance and exits to/from the office based on the nasty culture of fear and intimidation propagated by Jones. Mr. Hood explained that black Americans endured all sorts of sub-human indignities, and Mr. Hood preferred to use the front door for which many Americans both white and black had fought to gain access (the front door was also logistically more efficient to use given its proximity to the parking garage vs the back door).

57.    Mr. Hood called Chairman/CEO Jones on his cell around 5 PM when he left the bank, an hour and a half after Jones left at 3:30 PM without being verbally assaulted, and left him a voice mail that he was leaving and to call him if he needed anything. Hood called again that evening to let Jones know he was returning to the office, but Jones sent his call to voicemail again.

58.    HR Chief Baumbach called Mr. Hood multiple times that evening (from 8:52 PM to 9:26 PM) with the intent to terminate Mr. Hood by urging Mr. Hood to "take tomorrow off" so that Gulf Capital Bank's senior management team can finish inventing the reasons they will concoct to terminate Mr. Hood.

59.    Mr. Hood then called his boss President Homeyer and returned a call to HR Craig Baumbach (he had called Mr. Hood 3x between 8:52 PM and 9:26 PM) explaining to each of them separately that he was headed the office, and Mr. Hood was trying to call Jones but couldn't reach him and Mr. Hood wanted Jones to know that he was willing to stay at the office all night if Jones wanted or needed. Mr. Hood also told each of them that he regarded Jones as having verbally abused him without provocation. For his part HR Chief Baumbach threatened Mr. Hood's family if Mr. Hood continued to seek redress for the verbal abuse and other harassment. Mr. Hood has the evidence to prove this threat to his family.

60.    It is no surprise then that while Gulf Capital Bank claims to have the capabilities of the "big banks" regarding banking services, the similarities stop there: Gulf Capital Bank refused to close its offices for the federal bank holiday of Juneteenth in defiance of racial harmony.

61.    The next day, August 20, 2021, Hood began a normal workday at home. Hood sends emails to Chairman/CEO Jones, HR, President Homeyer, etc. documenting the verbal assault, the medical concerns, and the racism discussion. Mr. Hood also gave Chairman/CEO Jones a list of things he would be working on. He received no response. Mr. Hood also called his

boss President Homeyer a few times as he needed to speak with him a few matters, again, with no response. Tellingly, the Bank closed the office that day anyway.

62.  Out of the blue, Mr. Hood received a phone call from HR Joel Craig Baumbach at 11:30 AM informing him "the decision has been made to terminate your employment effective today" and that Mr. Hood is "not allowed on bank premises," etc. and do "not contact any bank employees." Baumbach did not give a reason for Mr. Hood's termination. He only told Mr. Hood someone at the bank would pack up his personal effects and mail it to him and that they would give Mr. Hood a FedEx label to return bank property.

63.  Craig Baumbach flatly refused to answer Mr. Hood's direct question "who made the decision to fire me and why?" further indicating the illegal nature of Mr. Hood's firing and a conspiracy to cover up the real reason and invent pretexual reasons for Mr. Hood's firing.

64.  The Bank's stock incentive plan, of which Mr. Hood was a participant before being fired, requires the Bank's Board to declare and affirmatively notify an employee if a subject employee's termination is "for cause"; there was never any such notification provided to Mr. Hood as the Bank and Insperity know that Mr. Hood was unjustly fired for unlawful and discriminatory reasons as outlined herein.

65.  On or about Aug 25, 2021, Chief of Human Resources Joel Craig Baumbach sent a FedEx package to Hood's home purportedly containing the personal effects that were in Hood's work station. Astonishingly, but fitting an unprofessional and unlawful discriminatory pattern, Gulf Capital Bank exercises one more act of harassment, hostility, and immaturity: not all of Mr. Hood's personal items were sent, random bags of chips were included that were not part of Hood's personal effects (the implication being that Mr. Hood has a "chip" on his shoulder), and a questionable tool used as a sex toy/castration device that did not belong to Mr. Hood (a classic example of white male privilege to desire to castrate a black

male). Missing items included Mr. Hood's *Holy Bible*, book *Invisible Man* by Ralph Ellison, various notebooks, and book *God's Trombones* by James Weldon Johnson, and a receipt where Mr. Hood took a prospect to lunch at Taste of Texas near the prospect's headquarters and a notebook among other items. Mr. Hood asked Baumbach and Bank counsel FisherPhillips LLP to return his items but received no response.

66.    This fact set conclusively proves that Gulf Capital Bank at its highest levels of executive management was concerned about Mr. Hood's lawsuit against racist BBVA USA / PNC Bank and finally decided to symbolically place its knee on Mr. Hood's neck and terminate him because of Mr. Hood's internal complaints about verbal abuse and racism, the BBVA lawsuit, the reporting of fraud concerning the Main Street Lending Program, and Mr. Hood's upcoming medical leave and requested disability accommodation. When Chairman/CEO Ed Jones was confronted for his unlawful discriminatory and bully behavior towards Mr. Hood, Mr. Hood did what MLK Jr. did to Bull Connor and turned a bull into a steer by calling out the culture of racism and tolerance thereof, the verbal assault, and the retaliation from Mr. Hood's lawsuit and health concerns. Now Chairman/CEO Jones seeks to impose the Colin Kapernick treatment by sabotaging Mr. Hood's career—this is the classic all American playbook when courageous black men stand against the cowardice of white supremacy and white male privilege. Rather than responsibly investigating Mr. Hood's legitimate complaints, the company thumbed its nose to law and order and decency and boldly put its knee on Mr. Hood's neck to clear its employment ranks of its only black male.

## Hood's Exemplary Performance

*"Yea, mine own familiar friend, in whom I trusted, which did eat of my bread, hath lifted up his heel against me." **Psalm 41:9***

67.    Mr. Hood's performance never suffered and in fact, his clients raved about him so much that

the Bank often found itself no other option than to assign their biggest, most important clients to Mr. Hood. But that didn't always happen initially as in at least one case, Mr. Hood didn't take over the Bank's largest client until another white male banker, Stan Grisham, so poorly handled the client relationship, that the Bank was left with no other choice than to assign this important account to Mr. Hood per the client's request. This happened so fast that Mr. Hood only received two hours' notice before he was to meet this high-profile client at River Oaks Country Club Men's Locker Room for lunch (naturally, all white males were present except for the servants). Stan Grisham's poor performance on this relationship nearly cost the client be demanded repayment of the $36 million Main Street loan by the Federal Reserve Bank of Boston or seek alternative financing at more than TRIPLE the Main Street Loan interest rate.

68.     Luckily, but not surprisingly, Mr. Hood was able to lift the relationship out of the grave and at the time of his termination was actively in discussions with leadership at the Federal Reserve Bank of Boston to hopefully save the client from having $36 million in debt be accelerated (ipso facto as a Main Street loan client, this client does not have the ability to repay $36 million in debt and therefore, Stan Grisham's poor performance would likely result in the bankruptcy of this 40-year old Houston business if the Federal Reserve Bank of Boston chooses to accelerate the debt). Stan Grisham's gross incompetence and negligence is second place only to his racism towards Mr. Hood as a black American. President Homeyer blamed bank counsel Hunton Andrews Kurth for the poor loan documentation, but nevertheless, directed Mr. Hood to seek their guidance in order to try to fix the loan documents to help the client avoid bankruptcy and the violation of Federal law related to the CARES Act caused by Stan Grisham.

69.     Further, Mr. Hood was called in to handle another high-profile client, a Houston billionaire's

Colorado golf course investment, where investors purchased the distressed project for $15 million after the Hunt family spent over $130 million on the property. Despite the active and strenuous objections of the Bank's Chief Credit Officer, Tricia Atchison, owing to this out-of-lending-territory project's negative cash flow and the fact that the bank deviated from prudent underwriting standards by not requiring even the most basic of financial documents from the client nor liquidity verification, Bank Chairman/CEO Jones bullied this $5 million loan to approval having Mr. Hood to write it up.

70. Just a matter of days before Mr. Hood's unlawful and unfair retaliation termination this billionaire client sang Mr. Hood's praises when he met with Bank Chairman/CEO Ed Jones and President Jonathan Homeyer at the golf club in Colorado. That is to say nothing of the fact that Jones and Homeyer excluded Mr. Hood from this client site visit despite Mr. Hood being the Senior Relationship Manager on the account.

71. Not even 27 hours prior to this unlawful and unfair termination, Mr. Hood's boss President Homeyer lavished praise on him as a billionaire client sang Mr. Hood's praises to President Homeyer in Colorado about a loan Mr. Hood closed for him. Mr. Hood closed $50 million in loans, had a pipeline for another $40 million before year-end 2021, and brought about $450 million in loan opportunities since joining the bank in June 2020. Since then, the bank has made over $1.6 million in loan fees from Mr. Hood's clients and over the multi-year period the loans would be outstanding, will earn the bank over $12 million in interest income and loan/bank fees.

72. Hunton AK and Holly Williamson recklessly and maliciously violated Mr. Hood's right to privacy by publishing his Social Security Number in pleadings for Hood v BBVA USA despite her own failed attempt to seal her divorce records and use of a pseudonym in another case. Ms. Williamson passed confidential information that she had obtained from the BBVA

lawsuit to Gulf Capital Bank's board of directors and executive management in advising the Bank to terminate Mr. Hood.

73.    Insperity promised to investigate Mr. Hood's claims of racism, retaliation, discrimination, and his illegal termination, but either failed to do so or didn't bother reporting back to Mr. Hood on any results. Further, Insperity Associate General Counsel Lecia Chaney yelled at Mr. Hood via email with the yelling being the online version of bullying by using all caps in bold face type and underline.

74.    Insperity was complicit in Mr. Hood's unlawful termination and guided as much to Bank executives. Insperity acted in concert with the Bank as Gulf Capital Bank relied upon Insperity's advertised expertise. Indeed, the Bank's employee handbook refers to the two entities together as the "Bank and Insperity" and directs employees to contact Insperity and bank management as though they are one and the same. Further, at the commencement of the litigation herein, the Bank and Insperity were using the same counsel with Fisher Phillips LLP. Seeing the obvious issue it would pose in a co-employer vs. joint employer determination, Fisher Phillips no longer represents the Bank.

75.    Insperity markets itself as a key partner (i.e. joint) especially for companies like Gulf Capital Bank in the financial services sector. Insperity's exists to train and give information to its clients and clients routinely rely upon and act together with Insperity to implement said advice. Insperity exists to fill the void for costs that small companies like Gulf Capital Bank cannot afford. Any attempt by Insperity to absolve itself of liability is surely based on a voodoo analysis designed to obfuscate the company's true purpose in acting with its clients and giving its clients advice to act together.

76.    Further, when Plaintiff first notified the Bank and Insperity of the pending lawsuit filing, the law firm Fisher Phillips stated it was representing both the Bank and Insperity. Upon

realizing the obvious mistake that this could undermine claims that they are acting separately (and likely not wanted to be tied to Ed Jones), Insperity and Gulf Capital Bank ended the joint legal counsel representation.

77.    It's worth nothing that Insperity didn't even bother with a perfunctory press release in the wake of George Floyd; it was not an oversight as the company produced 100s of other press releases in 2020. Insperity's C-suite is exclusively white and nearly all male. Even the women in the c-suite are not really important or powerful as they are not listed in the proxy statement alongside the real executives who are all white males as "named executive officers" of the company.

78.    Importantly, Insperity warns its investors in its SEC filings that Insperity could be "found liable for the actions of its clients" given the vast responsibilities that Insperity assumes for its clients. Specifically, Insperity warns its investors that it could be held labile for violations of the very laws that Mr. Hood indicates both Insperity and the Bank violated including federal and state laws prohibiting discrimination based on race, sex, disability status, etc.

79.    Insperity also references its public competitors. However, TriNet, for example, does not have a similar disclaimer for its investors because it doesn't assume the same risks as Insperity.

80.    Insperity can't have it both ways. Either they have lied to the SEC and the investor community by saying "we can be held liable" or they are lying to the Court by saying "we cannot be held liable" as these statements cannot co-exist in truth.

81.    Several examples are available in Insperity's public filings with the US Securities and Exchange Commission where it makes it clear that because of its agreements with its customers, the company can face liability for its relationships with its customers.

82.    The below charts are from Insperity's public investor presentations wherein the company

communicates with its current and potential investor community, its banks, its employees, and anyone desiring to access this information via Insperity's website.



87. Chairman/CEO Jones' unlawful behavior towards Mr. Hood meets the standard of a hate crime in many jurisdictions around the world. It is the exact same racist attitudes that manifest in mass shoots of black American citizens in churches, grocery stores, and police

brutality (and firing from a private bank).

88.    The Bank continues to suffer massive financial losses and has never reported a profit in its history. Further, the financial results are a far deviation from budget/plan.

**A Pattern of Discrimination Against People of Color and Harassing Behavior**

*"To apply any other test—to deny a man his hopes because of his color or race, his religion or the place of his birth—is not only to do injustice, it is to deny America and to dishonor the dead who gave their lives for American freedom." **President LBJ, March 1965***

89.    Chairman/CEO Jones is a classic corporate bully who retaliates against those who speak out for what's right and unlawfully applies his personal biases. He fired the CFO Noreen Skelly (now with San Antonio-based Broadway Bank) for finally standing up to him as a Hispanic female and for refusing to carry out a questionable financial transaction at the direction of Chairman/CEO Jones. Ms. Skelly has been a bank CFO for over 20 years for both publicly-traded and private-held banks and holds an MBA from The University of Chicago Booth School of Business.

90.    The bank didn't even bother interviewing women or persons of color (not to mention not even posting the CFO job) for the CFO role naming instead Larry Lehman of now defunct Pioneer Bank. The job remained unfilled nearly a year after Ms. Skelly's unfair firing. As of January 2022, the bank had also lost its Chief Credit Officer.

91.    Jones also has a history of abuse and harassment not only clearly demonstrated in Jones' divorce proceedings from Mitzi Renee Jones that necessitated a court-ordered restraining order signed by a Texas State District Judge to prevent (hopefully) Jones from causing "physical harm to any person", engaging in "coarse, profane language", making "threats of violence", "falsifying written records", placing "harassing, anonymous telephone calls", etc. Chairman/CEO Jones has a clear, lawfully documented history spanning several decades of

engaging in the sort of unlawful activity he has now leveled against Mr. Hood by saying Mr. Hood was leaving "early" that's tantamount to accusing Mr. Hood of stealing from the Company by getting paid while not working. Chairman/CEO Jones knows that Mr. Hood was, in fact, not stealing from the Bank that's why Chairman/CEO Jones nor Insperity ever notified any law enforcement of any alleged theft because there was no theft. There was only Chairman/CEO Jones behaving as the violent, biased bully that he is and he knows it.

92.    Chairman/CEO Jones also pushed a loan through to friends of his where the loan balance represented 99% of the Bank's legal lending limit—no bank, let alone a new bank, should be anywhere close to this limit when the House limit is 50% of the legal lending limit.

93.    A childhood friend of Chairman/CEO Jones borrowed over $2.25MM from Gulf Capital Bank on "collateral" of a term life insurance policy. Rather than follow prudent lending standards and correctly record the loan as unsecured, the bank recorded it as a secured loan, which falsely inflates already poor financials as it requires less capital held against that loan.

94.    Further, the Bank's culture can sometimes be a bit pedantic with Board Member Reed Morian finding himself "irate" over a client-paid legal bill from Houston law firm Hunton Andrews Kurth since Mr. Morian also has a financial interest in this client. Mr. Morian's wife refused to obtain an ATM card from the Bank because the Bank had no "free" ATMs for customers to access their cash.

95.    Ed Jones also expressed anger towards Mr. Hood when Mr. Hood questioned support for a loan to an individual, Miguel Loya, who is under an active FBI investigation and under the scrutiny of international prosecutors, which was a loan in special assets already at existing lender BBVA (now PNC Bank)—the same bank Mr. Hood sued in Harris County District Court. Chairman/CEO Jones failed to disclose to the Gulf Capital Bank board of directors that his support for Miguel Loya was likely the result of Miguel Loya's brother, Enrique Javier Loya, having purchased Chairman/CEO Jones' personal residence in August 2002 (8607 Pasture View Lane 77024) after Chairman/CEO Jones' violent and contentious divorce from Mitzi Rene Jones in January 2001 and marriage to Brenda Franks Love in June 2003.

96. Chairman/CEO Jones also told Mr. Hood that it was "bullshit as the FBI did the same thing to my [Ed Jones'] son [Reese Jones with Houston-based Kinetic Pressure Control while doing business in Brazil] and it was bullshit." Indeed, Jonathan Homeyer had also told Mr. Hood that Ed Jones' son had been subjected to a similar FBI investigation. The loan ultimately did not close at GCB, but the process fits the pattern for Ed Jones' behavior toward Mr. Hood.

97. Chairman/CEO Ed Jones also told Mr. Hood that "documents don't pay back loans, people do" in response and objection to Mr. Hood's efforts to properly document a loan according to credit policy, advice of bank counsel, Texas banking regulations, and general prudent lending standards based on Mr. Hood's nearly 20-years' experience in financial services.

98. Ed Jones also personally approved 2 SBA PPP loans totaling over $2 million for his wife's (Brenda Love) business, Love Advertising—firm with exactly zero African American employees and clients such as Gulf Capital Bank (not surprisingly), Shell, Gallery Furniture, Phillips66, CenterPoint Energy, John Moore, Perry's Restaurants, etc.

99. When Mr. Hood told Ed Jones that he wanted to bring over Mr. Neil Bush as a client, Mr. Jones was dismissive saying that "he's my neighbor, but he's a loser but maybe he has money now that his dad [former President George H.W. Bush] is dead."

## DAMAGES

*"There is separation of colored people from white people in the United States. That separation is not a disease of colored people. It is a disease of white people. I do not intend to be quiet about it." Albert Einstein, 1946*

100. As a result of Defendants' unlawful conduct, Plaintiff has suffered economic and actual damages, including past and future lost income, back wages, interest on back pay and front pay, future wages or front pay, lost earnings in the past and future, lost employment benefits in the past, and employment benefits and other benefits in the future. Plaintiff has also incurred other actual damages as a result of Defendants' unlawful conduct, including but not limited to past and future pecuniary losses, emotional pain and suffering, inconvenience, mental anguish, loss of earning capacity, loss of enjoyment of life, injury to professional standing, injury to character and

reputation, and other pecuniary and non-pecuniary losses.

101.    Plaintiff additionally brings suit for compensatory damages, including emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to professional standing, injury to character and reputation, injury to credit standing, job search expenses, lost earning capacity in the past and future, and other pecuniary and non-pecuniary losses.

102.    The conduct committed by Defendants against Plaintiff is the type of conduct demonstrating malice or reckless indifference to the rights of Plaintiff. Therefore, Plaintiff additionally brings suit for punitive damages.

## COUNT I

### RACE DISCRIMINATION IN VIOLATION OF TITLE VII

103.   Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

104.   Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended, makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1).

105.   Gulf Capital and Insperity violated Plaintiff's right to be free from discrimination based on race.

106.   Plaintiff exhausted his administrative remedies for all claims by filing a charge with the EEOC and receiving notice of his right to sue before timely filing this action against the Defendants.

107.   Plaintiff has suffered damages as a result of Defendants' unlawful actions.

## COUNT II

### RETALIATION IN VIOLATION OF TITLE VII

108.   Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

109.   Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended, makes it unlawful to retaliate against individuals who oppose practices that violate Title VII. 42 U.S.C. § 2000e-3(a).

110.   Plaintiff engaged in activity protected by Title VII's anti-retaliation provision.

111.   Defendants took adverse actions against Plaintiff as a result of his protected activities.

112.    Plaintiff exhausted his administrative remedies for all claims by filing a charge with the EEOC and receiving notice of his right to sue before timely filing this action against the Defendants.

113.    Plaintiff has suffered damages as a result of Defendants' unlawful actions.

## COUNT III

## DISCRIMINATION UNDER TEXAS LAW

114.    Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count III of this Complaint.

115.    Plaintiff belonged to a protected group.

116.    Plaintiff was subjected to race discrimination and harassment.

117.    The harassment complained of was based upon race.

118.    The harassment was sufficiently severe or pervasive to affect a "term, condition or privilege" of employment; and

119.    The employer knew or should have known of the harassment and failed to take remedial action. See TEX. LAB. CODE § 21.051.

120.    Plaintiff exhausted his administrative remedies for all claims by filing a charge with the EEOC which was cross-filed with the Texas Workforce Commission. All conditions precedent to the maintenance of this case have occurred.

121.    Plaintiff has suffered damages as a result of Defendants unlawful actions.

## COUNT IV

## RETALIATION UNDER TEXAS LABOR CODE

122.    Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count IV of this Complaint.

123.    At all material times, Defendants were engaged in an industry affecting commerce and had 15 or more employees for each working day in each of 20 or more calendar weeks in the

current or preceding calendar year. Defendants were thus an employer within the meaning of TEX. LAB. CODE § 21.002(8).

124.    At all material times, Defendants employed the Plaintiff.

125.    Plaintiff exhausted his administrative remedies for all claims by filing a charge with the EEOC which was cross-filed with the Texas Workforce Commission. All conditions precedent to the maintenance of this case have occurred.

126.    Plaintiff (1) opposed a discriminatory practice; (2) made or filed a charge; (3) filed a previous discrimination complaint; and/or (4) testified, assisted, or participated in any manner in an investigation, proceeding, or hearing.

127.    Defendant committed an unlawful practice when it retaliated or discriminated against Plaintiff for doing so. See TEX. LAB. CODE § 21.055.

128.    Plaintiff has suffered damages as a result of Defendants' unlawful actions.

## COUNT V

### VIOLATIONS OF
### AMERICANS WITH DISABILITIES ACT

129.    Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count V of this Complaint.

130.    The Americans with Disabilities Act ("ADA") requires an employer to provide reasonable accommodations of an otherwise qualified employee's known disability.    42 U.S.C. §12112(b)(5)(A).

131.    The ADA also prohibits employers from discriminating against a qualified individual on the basis of disability in regard to the terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a).

132.    Plaintiff requested a reasonable accommodation of his disability, to be able to work from home.

133.    Defendants discriminated and retaliated against Plaintiff based on his disability after he

disclosed his diagnosed disabilities and requested an accommodation.

134.    Plaintiff has suffered damages as a result of Defendants' unlawful actions.

## **DEMAND FOR JURY TRIAL**

135.    Plaintiff demands a trial by jury of all the issues in this case so triable.

## **PRAYER FOR RELIEF**

136.    WHEREFORE, cause having been shown, Plaintiff prays for, on trial of this just cause,

judgment against Defendants as follows:

a.    All actual damages, including but not limited to past and future lost wages, past and

future lost benefits, consequential damages;

b.    Mental anguish / compensatory damages; Exemplary/punitive damages;

c.    Pre-judgment and post-judgment interest as allowed by law;

d.    Court costs and expenses, and litigation expenses, including but not limited to the

expenses for any expert witnesses;

e.    Equitable relief, including front pay; and

f.    Any such further relief as the Court deems proper and just under the circumstances.

Respectfully Submitted,

**Michael Hood**
*Pro Se*
13207 Water Oak Park
Circle, Houston, TX 77429
713.303.4350
mikethood@gmail.com